FILED

2006 May-12  AM 07:57
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **NOLA M. ABBOTT, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | **CIVIL ACTION NO. CV-01-1556-** |
| | ) | **VEH** |
| | ) | |
| **v.** | ) | |
| | ) | |
| **CHEMICAL TRUST, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter comes before the court on: (1) Plaintiffs' (hereinafter "Abbott")

Motion to Set Aside the Dismissal of the First National Bank of Onaga, Kansas

(hereinafter "Bank"), as a defendant (doc. 78); (2) the Bank's Motion to Enforce the

Settlement Agreement (doc.80); and (3) the Bank's Motion for Sanctions (doc. 89).

The court **ORDERS** as follows:

1)      Abbott's Motion to Set Aside the Dismissal is treated as a Motion for

        Reconsideration by this court as Abbott is seeking relief from an

        interlocutory order entered in this case by the U.S. District Court for the

        District of Kansas (hereinafter "Kansas Court").  For the reasons stated

        herein, Abbott's Motion to Set Aside is **DENIED**.

2)      The Bank's Motion to Enforce the Settlement Agreement is **TERMED**

as moot.

3)    For the reasons stated herein, the Bank's Motion for Sanctions is
      **DENIED**.

<u>**Facts**</u>[1]

In July 1999, Cliff Wilkinson contacted defendant First National Bank of
Onaga, Kansas about the possibility of the Bank handling self-directed IRAs for
people wishing to purchase an investment from Chemical Trust, an asset referred to
as the Alliance Trust Guaranteed Contract Agreement.[2]   According to plaintiffs, Mr.
Wilkinson is a trustee of Chemical Trust and a "co-manager of Chemical Trust's
affairs." Mr. Wilkinson was referred to Jena Rieschick, the Bank's Vice President of
Operations and IRA officer.  In an effort to determine whether the Bank could "hold"
the Chemical Trust asset, Ms. Rieschick requested additional documentation from Mr.
Wilkinson concerning the asset.  On July 19, 1999, Mr. Wilkinson sent additional
documents to Ms. Rieschick via facsimile, including a Certificate of Investment, a
sample Surety Payment Bond and various marketing brochures.  According to Ms.
Rieschick, however, she did not review the marketing brochures because "we don't

---

[1]These facts are adopted from the Kansas Court's Memorandum and Order on the Bank's
Motion for Summary Judgment.

[2] Alliance Trust was the predecessor to Chemical Trust.

look at those."  In any event, to determine whether the Bank was willing to administer the Chemical Trust asset, Ms. Rieschick "looked at the interest rate, the maturity date, that the payments were on some type of schedule, that it had a principal amount, and that...it was a secured note."  Ultimately, Ms. Rieschick explained that the Bank could hold the asset.  In fact, on the transmittal letter from Mr. Wilkinson on July 19, 1999, Ms. Rieschick made a notation, "Asset OK."  Ms. Rieschick explained that this notation signified that she had determined that the asset was "administratively feasible."

It is undisputed that Ms. Rieschick never reviewed or evaluated the Chemical Trust asset for purposes of assessing the asset's viability as an investment.  In other words, in determining that the Alliance Trust Guaranteed Contract Agreement was administratively feasible, Ms. Rieschick did not determine what Alliance Trust or Chemical Trust did to produce income for its investors.  She did not conduct any type of background check on Cliff Wilkinson.  She did not check with the Better Business Bureau to ascertain whether there were any complaints about Alliance Trust or Chemical Trust.  She did not check with the Secretary of State for any state to determine the nature of Alliance Trust's or Chemical Trust's business.  She did not determine whether Chemical Trust was registered with the Securities Exchange Commission.  In short, in evaluating Chemical Trust, Ms. Rieschick looked only at

the Chemical Trust asset and simply determined that "it was a type of debt instrument, like a note" and that the asset was "OK" (*i.e.*, administratively feasible).[3]

After the Bank agreed to administer the Chemical Trust asset, Chemical Trust sent a memorandum to various agents responsible for marketing the Chemical Trust investment in which the agents were instructed to tell investors to use either the Bank or Fidelity National Bank of Atlanta as custodian banks for purposes of opening self-directed IRA accounts through which the investors could purchase the Chemical Trust asset.[4]   Beginning in July 1999, the Bank opened new IRA accounts for customers desiring to invest in Chemical Trust and, pursuant to these customers' instructions, purchased the Chemical Trust asset.   None of the plaintiffs had any personal contact with the Bank prior to opening their accounts.   Between August 1999 and October 1999, the Bank purchased Chemical Trust assets for 79 customers, including eight plaintiffs.[5]   According to Ms. Rieschick, the Bank made no

---

[3] Apparently, in July 1999, two states' securities commissions (North Dakota and Iowa) had already entered cease and desist orders against Mr. Wilkinson and Alliance Trust.

[4] It appears that Chemical Trust's agents offered investors two options in terms of purchasing the Chemical Trust asset.  Investors could either convert existing IRA's into cash (with punitive tax consequences) and write a check to Chemical Trust or, using specific custodian banks, open new self-directed IRA's.

[5] During this time, at least five other states (Kansas; Arkansas; Illinois; Pennsylvania; Arizona) entered cease and desist orders against Mr. Wilkinson and Alliance Trust/Chemical Trust.

assessment of risk prior to purchasing the Chemical Trust asset.[6]  Thereafter, the Bank issued monthly "Investment Reviews" to plaintiffs which identified a market value for the Chemical Trust investment.  These statements indicated that the Chemical Trust investment was "currently valued at cost."  According to the Bank, the custodian agreement executed by plaintiffs states that the Bank "may use any method or policy" to value assets and that because the Chemical Trust assets were not publicly traded, the Bank decided to value the asset based on purchase price.  Ms. Rieschick admitted, however, that the Bank did not determine whether plaintiffs could resell the Chemical Trust asset for the original purchase price.

On October 1, 1999, the United States District Court for the District of South Carolina issued a grand jury subpoena to the Bank to testify in a criminal action against Mr. Wilkinson, Alliance Trust and Chemical Trust.  The subpoena was accompanied by an order issued by a United States Magistrate Judge for the District of South Carolina in which the Magistrate Judge ordered that the Bank "shall not provide the individuals and/or entities listed on the Grand Jury subpoena, either directly or indirectly, with notice of the fact of service upon it of the Grand Jury

---

[6] In fact, Ms. Rieschick testified that the Bank, in its role as a custodian bank, never assesses the risk of any investments.  Rather, the Bank only assesses whether the bank can "hold" a particular investment as a custodian.  In other words, the Bank handled or evaluated the Chemical Trust asset in the same manner as it handled or evaluated all other assets.

subpoena duces tecum...or of the nature of the documents whose production is commanded under the terms of the subpoena, or of the fact that such documents have been produced before the Grand Jury in compliance with the subpoena's terms, or notice of any other information furnished to the Grand Jury, for a period of ninety (90) days from the date of service of this Order upon [the Bank]."  The order was issued based on the Magistrate Judge's belief that notification to the parties listed in the grand jury subpoena "will result in seriously jeopardizing" the grand jury's investigation.

The Bank received the grand jury subpoena on or about October 5, 1999.  After receiving the grand jury subpoena, Ms. Rieschick contacted FBI agent Paul Jacobs, who told her that the FBI was investigating Chemical Trust as a fraudulent scheme. According to Ms. Rieschick, "per the direction of the subpoena and based upon the advice of legal counsel," the Bank did not disclose the receipt of the subpoena to any outside party, including investors in the Chemical Trust asset, and continued to purchase Chemical Trust assets for new customers.[7]  According to Ms. Rieschick, the

---

[7] Ms. Rieschick averred that she asked Agent Jacobs whether the Bank should stop purchasing Chemical Trust assets and that Agent Jacobs advised Ms. Rieschick to continue to handle the accounts as it had been.  Ms. Rieschick further averred that she asked Agent Jacobs whether the Bank should conduct some form of due diligence with respect to Chemical Trust. According to Ms. Rieschick, Agent Jacobs told her that he would prefer that the Bank not do so unless it was the Bank's standard procedure to do so.  As conducting such due diligence was not the Bank's standard procedure, the Bank conducted no due diligence at that point with respect to Chemical Trust.

Bank continued to purchase the assets because "at that time we had nothing that was public knowledge that would allow us to stop purchasing the asset."  According to plaintiffs, however, the grand jury subpoena did not state that the Bank could not inform its customers that Chemical Trust investments were the subject of a criminal investigation.  In any event, on October 7, 1999, a customer service representative at the Bank received a phone call from Charles Kilway, a state representative, asking whether the Bank had heard anything negative about Chemical Trust and indicating that Chemical Trust was under state investigation.  Nonetheless, the Bank continued to purchase Chemical Trust assets for its customers.

On approximately November 1, 1999, a customer of the Bank sent to the Bank a copy of a letter from the Oklahoma Securities Commission indicating that the Commission was investigating Chemical Trust.  Because the Oklahoma notice was "public information," Ms. Rieschick discussed with legal counsel the possibility of taking "further action in regards to the asset."  With the apparent approval of its legal counsel, the Bank called a special meeting of its executive committee.  At that meeting, the Bank resolved that the "corporate policy of the Bank be amended and revised to restrict the bank from serving as custodian for Guaranteed Contract Agreements and similar type of investments" and that "the Bank should resign immediately as the custodian of any Guaranteed Contract Agreements and similar

types of investments, as soon as conveniently and legally possible."  According to Ms. Rieschick, the policy change "was a means for our attorney to come up for–with a reason for us not to take them without having to say why, basically."  In any event, the Bank did not purchase any Chemical Trust assets after November 3, 1999.

After the executive committee meeting, the Bank sent letters to all of its customers whose funds it had invested in Chemical Trust.  In the letter, the Bank explained that it was resigning as the custodian of those accounts–including plaintiffs' accounts–simply because "we were informed that your investment was going to be in the form of a promissory note, but we now believe that your investment will be in the form of a guaranteed contract agreement."[8]  In other words, the Bank did not advise its customers of the true reason it was resigning as custodian.  On November 16, 1999, the Bank sent a letter to Chemical Trust explaining that it would no longer act as a custodian for the guaranteed contract agreements.  Despite the fact that the Bank issued resignation letters to its current customers and to Chemical Trust, the Bank continued to open IRA accounts for new customers desiring to purchase Chemical Trust assets.  According to plaintiffs, once these new accounts were open

---

[8] Ms. Rieschick admitted, however, that a guaranteed contract agreement is no different from a promissory note.

and the requisite fees paid to the Bank,[9] the Bank refused to purchase the Chemical Trust assets it had been directed to purchase by new investors. Ms. Rieschick averred, however, that if the account application and accompanying documents did not mention Chemical Trust, then the Bank could have established an account without knowing that the customer intended to purchase the Chemical Trust asset.[10] In any event, once the Bank learned that a new customer desired to invest in Chemical Trust, the Bank informed the customer of the policy change and gave the customer the option of closing the new account.

## Procedural History

This case was first filed in the U.S. District Court for the Northern District of Alabama on January 26, 2000. Abbott voluntarily dismissed that action on April 26, 2000, and re-filed it in the U.S. District Court for the District of South Carolina on April 28, 2000. The Bank filed counterclaims against Abbott. On January 22, 2001, the case was transferred to the U.S. District Court for the District of Kansas where the Bank filed a motion for summary judgment as to all Abbott's claims.

---

[9] Pursuant to the custodian agreement between the parties, the Bank was entitled to collect a base fee of $42 annually; a special asset fee of $24 annually; and a $6 safekeeping fee for holding the asset in the Bank's vault.

[10] Although Abbott asserts in its papers that the Bank "knew at the time these new IRA account applications were submitted that these new customers intended to invest in Chemical Trust," Abbott directs the court to no evidence in the record supporting that statement.

9

The Kansas Court granted the Bank's motion for summary judgment on April 27, 2001, and dismissed the Bank as a defendant to this action.  The Bank remained a party by virtue of its counterclaims against Abbott; however, the parties entered into a settlement agreement whereby the Bank would voluntarily withdraw its counterclaims against Abbott and, in exchange, Abbott agreed not to appeal the Kansas Court's decision granting the Bank's motion for summary judgment. Thereafter, the Bank withdrew its counterclaims and was dismissed as a party to this action.

Following the Bank's dismissal, Abbott, without notice to the Bank, successfully petitioned the Kansas Court to transfer this case to the U.S. District Court for the Northern District of Alabama.  On December 10, 2003, Abbott filed the instant motion seeking to have this court revisit the holding, dismissing the Bank, of the District Court of Kansas.  The Bank responded with motions to enforce the settlement agreement and for sanctions.

## Standard of Review

A district court has plenary power over an interlocutory order and the power to reconsider, revise, alter, or amend it.  *Toole v. Baxter Healthcare Corp.*, 235 F.3d 1307, 1315 (11th Cir. 2000) (citations and internal quotations omitted).

In the interests of finality and conservation of scarce judicial resources, reconsideration of an order is an extraordinary remedy and is employed sparingly. *See, e.g., Spellman v. Haley*, 2004 WL 866837, at *2 (M.D. Ala. Feb. 22, 2004) ("litigants should not use motions to reconsider as a knee-jerk reaction to an adverse ruling"); *United States v. Bailey*, 288 F. Supp. 2d 1261, 1267 (M.D. Fla. 2003); *Pennsylvania Ins. Guar. Ass'n v. Trabosh*, 812 F. Supp. 522, 524 (E.D. Pa. 1992). As a general rule, "[a] motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice." *Summit Medical Center of Alabama, Inc. v. Riley*, 284 F. Supp. 2d 1350, 1355 (M.D.Ala. 2003).

It is well established that "[a]dditional facts and arguments that should have been raised in the first instance are not appropriate grounds for a motion for reconsideration." *See, e.g., Rossi v. Troy State University*, 330 F. Supp. 2d 1240, 1249 (M.D. Ala. 2002) (denying motion to reconsider where plaintiff failed to submit evidence in question prior to entry of order and failed to show good cause why he could not have done so). Furthermore, the Eleventh Circuit has explicitly stated that "a motion to reconsider should not be used by the parties to set forth new theories of law." *Mays v. U.S. Postal Service*, 122 F.3d 43, 46 (11th Cir. 1997); *see also Russell*

11

*Petroleum Corp. v. Environ Products, Inc.*, 333 F. Supp. 2d 1228, 1234 (M.D. Ala. 2004) (relying on *Mays* to deny motion to reconsider where movant advanced several new arguments); *Coppage v. U.S. Postal Service*, 129 F. Supp. 2d 1378, 1379-81 (M.D. Ga. 2001) (similar); *Richards v. United States*, 67 F. Supp. 2d 1321,1322 (M.D.Ala. 1999) (same).

Notwithstanding these limitations, reconsideration is appropriate to correct manifest errors of law or fact. *See* Fed.R.Civ.P.60(b); *Caisse Nationale de Credit Agricole v. CBI Industries, Inc.*, 90 F.3d 1264, 1269 (7th Cir. 1996) ("Motions for reconsideration serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence."); *Summit Medical Center of Alabama, Inc. v. Riley*, 284 F.Supp.2d 1350, 1355 (M.D. Ala. 2003) ("A motion to reconsider is only available when a party presents the court with evidence of an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or manifest injustice."). The grant or denial of a motion to reconsider is left to the discretion of the district court. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023-24 (11th Cir. 2000).

## Analysis

I.    **Abbott's Motion to Set Aside / Motion for Reconsideration**[11]

Abbott argues that this court should reconsider the Memorandum and Order,

granting summary judgment in favor of the Bank, because the Kansas Court's

application of Kansas tort law to Abbott's tort claims is clearly erroneous and results

in a manifest injustice.[12]    As Abbott offers neither an intervening change in

controlling case law nor new evidence that was previously unavailable, the court will

only consider whether the Kansas Court's Order should be vacated to correct clear

error.  *See Summit Medical Center of Alabama, Inc.*, 284 F. Supp. 2d at 1355.

This court does not find clear error in the Kansas Court's holding.  Abbott

failed to address the choice-of-law issue in any of its papers before the Kansas Court,

and any arguments as to the improper application of choice-of-law are improperly

brought in the present motion.  *See Mays v. U.S. Postal Service*, 122 F.3d 43, 46 (11th

Cir. 1997) ("a motion to reconsider should not be used by the parties to set forth new

---

[11]The Memorandum and Order granting the Bank's motion for summary judgment was
entered by the Kansas Court on April 27, 2001.  Abbott filed its motion for reconsideration on
December 10, 2003.  The court notes that Abbott's motion for reconsideration would be untimely
had the motion been filed in the Kansas Court.  "Local Rule 7.3(b) requires that any motion to
reconsider be filed within ten days after the particular order at issue."  *PAS Communications, Inc.
v. Sprint Corp*., 2000 WL 1867571, *1 (D. Kan.2000).

[12]Abbott does not assert that the Kansas Court's application of Kansas law to Abbott's
breach of contract claims against the Bank is in error.  Therefore, this court will not offer analysis
as to the Kansas Court's choice-of-law as applied to those claims.

theories of law" not previously raised). The court is within its discretion to deny the motion for reconsideration on this basis alone; however, the court will provide additional analysis as to Abbott's argument regarding the Kansas Court's application of Kansas tort law in this case.

Abbott cites *Van Dusen v. Barrack*, 376 U.S. 612, 639, 84 S.Ct. 805, 821 (1964), in which the Supreme Court held "where defendants seek transfer [under 28 U.S.C. § 1404 (a)], the transferee district court must be obligated to apply the state law that would have been applied if there had been no transfer."[13] Abbott's central argument is that the Kansas Court committed clear error when it failed to adopt the holding in *Van Dusen* upon deciding that Kansas law governed Abbott's tort claims.

The Kansas Court held:

The threshold issue the court must resolve is which state's law to apply. In determining the applicable law, a federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999). With respect to plaintiffs' breach of contract claim, the custodian agreement executed by the parties contains an express choice-of-law provision whereby the parties agreed that "Kansas law shall govern this instrument, any other instrument executed in connection with [plaintiffs'] account[s] and [the parties'] rights and obligations hereunder or otherwise with respect to the account and assets." *See* Agreement § 8.15. Kansas courts generally

---

[13]The court takes notice that *Van Dusen* does not represent an intervening change in controlling law; rather, the case was available to Abbott throughout the duration of this action.

14

give effect to such provisions if the forum selected bears a reasonable relation to the contract at issue. *See National Equipment Rental, Ltd. v. Taylor*, 225 Kan. 58, 587 P.2d 870, 873 (1978). As Kansas certainly bears a reasonable relation to the custodian agreement executed by the parties, and as plaintiffs do not suggest that they did not freely enter into the choice-of-law provision, the court will apply Kansas law to plaintiffs' breach of contract claim. According to defendant, the court should also apply Kansas law to plaintiffs' tort claims. Plaintiffs have failed to address whatsoever the choice-of-law issue in their papers and, thus, are deemed to acquiesce to the application of Kansas law to their tort claims.[14]

The Kansas Court cited the holdings in *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)*, and *Bancoklahoma Mortgage Corp. v. Capital Title Co.*, 194 F.3d 1089, 1103 (10th Cir. 1999), for the proposition that, in determining the applicable law, a federal court sitting in diversity must apply the substantive law of the state in which it sits, including that state's choice of law rules.

Contrary to Abbott's interpretation, the holding of the Kansas Court was not that Kansas's choice-of-law doctrine should be applied as opposed to South Carolina's choice-of-law doctrine; rather, the Kansas Court applied Kansas tort law to Abbott's tort claims after determining that the choice-of-law issue was settled by an express provision found within the custodian agreement executed by the parties coupled with Abbott's failure to address the choice-of-law issue. In addition, had the

---

[14]In a footnote to the Memorandum Opinion, the Kansas Court notes that, additionally, "Plaintiffs may have acquiesced to the application of Kansas law to their tort claims because of the broad choice-of-law provision in the custodian agreement." (Internal citations omitted).

Kansas Court applied Kansas's choice-of-law test in lieu of South Carolina's test, contrary to the directive of *Van Dusen*, the error would be harmless. There is no difference between the choice-of-law doctrines applied by Kansas and South Carolina; both states apply the *lex loci delicti* test to dispense with choice-of-law issues absent an express choice-of-law provision or other mitigating factor.[15] Here, there is an express choice-of-law provision. Accordingly, Abbott's *Van Dusen* argument is misplaced.

A motion to reconsider is only appropriate when (1) there is an intervening change in controlling law, (2) new evidence becomes available, or (3) there is a need to correct clear error or manifest injustice. None of those situations are present in the instant case. Abbott has not cited this court to any binding precedent that indicates that the Kansas Court's holding on the application of Kansas tort law to Abbott's tort claims is clearly erroneous or results in a manifest injustice.

## II.     The Bank's Motion to Enforce the Settlement Agreement

This motion seeks to have the court either: (1) enforce the settlement agreement between the parties and strike Abbott's Motion to Set Aside; or, alternatively, (2) grant the Bank additional time within which to respond to Abbott's Motion to Set

---

[15]Under this test, a court applies the substantive law of the state in which the injury occurred.

Aside.  The Bank requested that the court rule on its Motion to Enforce the Settlement Agreement prior to ruling on Abbott's Motion to Set Aside; however, the court opts to first rule on Abbott's Motion to Set Aside.  Because the Bank subsequently filed a response to Abbott's Motion to Set Aside and because the court holds in favor of the Bank on that same motion, the Motion to Enforce the Settlement agreement is now moot.

### III.    The Bank's Motion for Rule 11 Sanctions

An appellate court reviews all aspects of a district court's Rule 11 determination for an abuse of discretion.  *Jones v. International Riding Helmets, Ltd.,* 49 F.3d 692, 694 (11th Cir.1995) (citing *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990)).

Rule 11(b) of the Federal Rules of Civil Procedure imposes a duty upon attorneys and parties to refrain from filing or pursuing frivolous claims.  *See* Fed.R.Civ.P. 11(b).  Rule 11 sanctions are proper: (1) when a party files a pleading that has no reasonable factual basis; (2) when the party files a pleading that is based on a legal theory that has no reasonable chance of success and that cannot be advanced as a reasonable argument to change existing law; or (3) when the party files a pleading in bad faith for an improper purpose.  *See Worldwide Primates, Inc. v. McGreal,* 87 F.3d 1252, 1254 (11th Cir.1996).  Rule 11(c) allows a court to "impose

17

an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation," which may include "some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *Id*.

The objective standard for testing conduct under Rule 11 is "reasonableness under the circumstances" and "what was reasonable to believe at the time" the pleading was submitted. *Baker v. Alderman,* 158 F.3d 516, 524 (11th Cir.1998). A court must follow a two part test: (1) whether the party's claims are objectively frivolous; and (2) whether the person who signed the pleadings should have been aware that they were frivolous. *Alderman,* 158 F.3d at 524.

Although sanctions are warranted when the claimant exhibits a "deliberate indifference to obvious facts," they are not warranted when the claimant's evidence is merely weak but appears sufficient, after a reasonable inquiry, to support a claim under existing law. *Alderman,* 158 F.3d at 524. The purpose of Rule 11 is to deter frivolous lawsuits and not to deter novel legal arguments or cases of first impression. *Id*. The grant of summary judgment, in and of itself, does not mean that an action is frivolous or warrants the imposition of sanctions. *Id.*

Rule 11 emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting upon a position after it is no longer tenable. *Ruszala v. Walt*

*Disney World Co.*, 132 F.Supp.2d 1347, 1352 (M.D. Fla. 2000).  "A litigant's

obligations with respect to the contents of these papers are not measured solely of the

time they are filed with or submitted to the court, but include reaffirming to the court

and advocating positions contained in those pleadings and motions after learning that

they cease to have any merit." *Ruszala*, 132 F.Supp.2d at 1352 (quoting Fed.R.Civ.P.

11, advisory committee's notes) (internal marks omitted).  "Rule 11 stresses the need

for some prefiling inquiry." *Worldwide Primates, Inc.,* 87 F.3d at 1254 (quoting *Mike*

*Ousley Productions, Inc. v. WJBF-TV,* 952 F.2d 380, 382 (11th Cir.1992)).

      In addition, Rule 11 mandates procedural requirements that, if ignored, prove

fatal to a movant under the rule.

> Rule 11(c)(1)(A) calls for a motion for sanctions to be made separately
> from other motions. Further, it may not be presented to [the] Court for
> twenty-one (21) days after the service of the motion for sanctions to the
> opposing party, in order to provide the party filing the motions to
> dismiss time to withdraw its challenged paper.  These provisions are
> intended to provide a type of "safe harbor" against motions under Rule
> 11 in that a party will not be subject to sanctions on the basis of another
> party's motion unless, after receiving the motion, it refuses to withdraw
> that position or to acknowledge candidly that it does not currently have
> evidence to support a specified allegation.  Under the former rule,
> parties were sometimes reluctant to abandon a questionable contention
> lest that be viewed as evidence of a violation of Rule 11; under the
> revision, the timely withdrawal of a contention will protect a party
> against a motion for sanctions.

*Rondolino v. Provident Life and Acc. Ins. Co.*,  1994 WL 143066, *2 (M.D. Fla.

1994) (citing Fed. R. Civ. P. 11).

Finally, "Rule 11 is not a fee-shifting statute ... [a] movant under Rule 11 has no entitlement to fees or any other sanction." *Business Guides, Inc. v. Chromatic Communications Enterprises, Inc.,* 498 U.S. 533, 553, 111 S.Ct. 922, 934 (1991). "Imposition of sanctions on the attorney rather than, or in addition to, the client is sometimes proper since it may well be more appropriate than a sanction that penalizes the parties for the offenses of their counsel. *Worldwide Primates, Inc.*, 87 F.3d at 1254 (internal marks omitted).

### A.     The Bank did not satisfy all procedural requirements under Rule 11

In its Motion for Sanctions, the Bank certifies that, "On December 30, 2003 [Defendant's counsel] wrote Plaintiff's counsel, W. Lewis Garrison, Jr., of Defendant's intent to file a motion for sanctions pursuant to Fed. R. Civ. P. 11 unless Plaintiff withdrew its Motion for Reconsideration."

According to the parties' papers, the Bank did not comply with the procedural directive of Rule 11(c)(1)(A) requiring service of the Motion for Sanctions on the opposing party twenty-one days prior to filing the motion with the court. The Certificate of Service attached to the instant motion indicates that a true and correct copy of the motion was mailed to Abbott on January 23, 2006. The Motion for Sanctions was filed with the court three days later, on January 26, 2004. The Bank's

letter to Abbott dated December 30, 2003, while sent more than twenty-one days prior to the filing of the Rule 11 motion with the court, is procedurally insufficient to allow the Bank to escape the "safe harbor" provisions of Rule 11. Due to the Bank's failure to adhere to Fed. R. Civ. P. 11(c)(1)(A), the Bank's Motion for Sanctions is due to be denied.

### Conclusion

As a result of this Order, the Bank remains dismissed as a party to this action. The remaining parties are **ORDERED**, within fourteen (14) days from the date of this Order, to confer and file a joint proposed schedule for the further disposition of this case.

**DONE** and **ORDERED** this 12th day of May, 2006.

**VIRGINIA EMERSON HOPKINS**
**United States District Judge**

21